IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                           21-cr-01042 RB

EDDIE JOE REZA,

    Defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
DENYING DEFENDANT'S MOTION TO SUPPRESS**

This matter comes before the Court on Defendant's Motion to Suppress. (Doc. 57.) Having reviewed the briefs and documentary evidence, hearing testimony, and being otherwise fully advised, the Court will deny the motion.

**I.      Procedural Posture and Background**

On April 19, 2021, the United States filed a Criminal Complaint charging Eddie Joe Reza with one count of felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). (Doc. 1.) The United States charged Reza by Indictment with the same charge on July 21, 2021. (Doc. 18.) Reza filed a Notice of Intention to Enter Guilty Plea on December 30, 2021, and pled guilty pursuant to a Federal Rule of Criminal Procedure 11(c)(1)(C) plea agreement on January 31, 2022. (Docs. 42; 47–49.) At sentencing, the Court rejected the Rule 11(c)(1)(C) plea agreement. (Doc. 56.) The Court later granted Reza's unopposed motion to withdraw his guilty plea, and Reza filed this motion to suppress. (Docs. 57; 60; 62.) Reza argues that the traffic stop was pretextual and that the arresting officer did not have probable cause to search his vehicle. (*See* Doc. 57.) The Government argues that under the totality of the circumstances, there was probable

cause to search the vehicle under the automobile exception to the warrant requirement. (*See* Doc. 61.) The Court held a hearing on July 6, 2022. (Doc. 70.)

## II.   Factual Findings

Rule 12(d) of the Federal Rules of Criminal Procedure provides that when factual issues are involved in deciding a motion, the Court must state its essential findings on the record. *See* Fed. R. Crim. P. 12(d). The Court makes the following factual findings based on the evidence in the record and evidence adduced at the hearings. At the July 6, 2022 hearing, the Court heard testimony from Chad Herrera, John Sneathen, Devon Stinson, and Israel Rodriguez.

On July 17, 2021, sometime between 8:00 and 10:00 p.m., a source of information (SOI) told Carlsbad Police Department (CPD) Detective Chad Herrera that Reza was driving a Nissan SUV with chrome rims near Lea Street in Carlsbad and was in possession of fentanyl pills and firearms. (*See* Doc. 71 (Tr.) at 8–10; *see also* Gov't Ex. 4.) The SOI had provided Herrera with credible and trustworthy information the month prior, which led to the arrest of a known felon in possession of a firearm. (*Id.* at 7–8.) The SOI informed Herrera that they had seen Reza in possession of the pills and guns, and Herrera believed the SOI's information was credible. (*Id.* at 9–10.) The SOI shared the information as a citizen-informant. (*Id.* at 10–11.) To Herrera's knowledge, the SOI was not working off criminal charges, and they did not receive payment or special treatment for providing the information. (*See id.* at 15, 21–22.) Herrera was unaware of whether the SOI has a criminal history. (*Id.* at 15.)

Herrera met Reza some months earlier when he interviewed him at Reza's home in connection with a burglary investigation. (*Id.* at 11.) Herrera knew that the vehicle the SOI described belonged to Reza's mother and that Reza was known to drive it. (*Id.* at 9.) Herrera also learned from his coworkers at the CPD that Reza, in the past, had possessed firearms and had

exhibited violent tendencies toward law enforcement. (*Id.* at 11–12.) Consequently, to promote officer safety, Herrera immediately shared the SOI's information with Sergeant John Sneathen, who was a supervisor with CPD assigned to the Pecos Valley Drug Task Force (PVDTF). (*Id.* at 12–14, 18.)

Sneathen has known of Reza for many years and knew him to drive a white Nissan SUV with chrome rims. (*Id.* at 25, 29.) Several years prior to this incident, Sneathen's colleagues were involved in "a large-scale shoot-out" with Reza. (*Id.* at 25.) Sneathen knew that PVDTF agents had received anonymous tips through Crime Stoppers and information from at least one confidential source (CS) that Reza was selling fentanyl in Carlsbad. (*Id.* at 25–26, 44.) The CS had previously purchased narcotics for the PVDTF and had proven to be a reliable source. (*Id.* at 26–27.) The CS had seen Reza in possession of fentanyl and knew from word of mouth in the local drug culture that Reza was a source of fentanyl pills. (*Id.* at 28.)

Sneathen contacted the on-call agent at PVDTF, Corporal Devon Stinson, to share Herrera's information. (*Id.* at 29–30, 46.) Stinson testified that he was also familiar with Reza's history of violence and drug trafficking and knew that he drove the white Nissan SUV. (*Id.* at 48–49.) Stinson contacted the on-duty supervisor with CPD, Sergeant Adrian Rodriguez (Sergeant Rodriguez), at approximately 10:00 p.m. (*Id.* at 51–52, 57.) He gave Sergeant Rodriguez the description and a picture[1] of the Nissan SUV and the information that Reza was probably in possession of fentanyl and firearms. (*Id.* at 51–52.)

At approximately 10:00 p.m., Sergeant Rodriguez conducted a patrol briefing with CPD officers beginning the "graveyard" shift. (*See id.* at 55, 64.) He told the officers to be on the lookout (BOLO) for Reza, who was in town driving a white SUV. (*Id.* at 64–65.) Sergeant Rodriguez

---

[1] The Government provided the photograph of the Nissan SUV that Stinson gave Sergeant Rodriguez as Exhibit 4. (*See* Tr. at 52.)

shared the SUV's license plate number. (*Id.* at 65.) Officer Israel Rodriguez (Rodriguez) was on duty and heard these details. (*Id.* at 64–65.)

      Around 11:00 p.m., Rodriguez was parked near the intersection of Texas and 5th Street, which is approximately half a mile or several city blocks from Lea Street. (*Id.* at 64–65, 120.) Another officer nearby radioed that he saw Reza's vehicle parked at a gas station a block away. (*Id.* at 66.) Rodriguez observed Reza's vehicle approach the intersection of Texas and 5th Street, and he began to follow the vehicle when it turned into a residential area of 5th Street. (*Id.* at 66–67.) Rodriguez ran Reza's license plate, and dispatch stated that the plate had expired in May. (*Id.* at 66.) Reza stopped at the intersection of Georgia and 5th Street, and when he moved forward, Rodriguez engaged his emergency overhead lights to conduct a traffic stop. (*Id.* at 68.) North 5th Street has one lane in each direction with several small dirt areas where cars can pull over. (*Id.* at 67.) Rodriguez and Reza were the only cars on that road, and Rodriguez saw nothing that would have blocked Reza's view of the patrol car. (*Id.* at 68, 73.) Reza did not immediately pull over but proceeded north on 5th Street and passed several dirt areas where he could have stopped. (*Id.* at 68.) Rodriguez stated that it is uncommon for individuals to continue driving after officers activate their emergency equipment. (*Id.* at 69.) Normally, drivers immediately pull over to the right if it is safe to do so. (*Id.* at 70.) In Rodriguez's experience, when drivers fail to pull over right away, it often means that they are calling someone or are preparing to jump out of the vehicle and run. (*Id.*) When Reza failed to pull over, Rodriguez honked his air horn twice. (*Id.* at 72.) Rodriguez testified that although it was safe for Reza to pull over right away, Reza drove approximately 300 meters before he turned into the Colonial Hillcrest Apartment parking lot and stopped about midway into a handicap spot. (*Id.* at 68–72.)

4

Rodriguez testified that Colonial Hillcrest Apartments are known to be a high violent-crime area. (*Id.* at 67.) Since Rodriguez joined the CPD in 2017, he has known this area to have homicides, shootouts, and burglaries. (*Id.* at 62, 67.) Rodriguez has "personally arrested several individuals for felony warrants" at the apartments. (*Id.* at 67.) Rodriguez's shift partners heard his call on the radio running Reza's license plate and, because of the nature of the BOLO, several officers responded as back-up. (*See id.* at 79.) As soon as Rodriguez pulled Reza over, K-9 Officer Judy Brakeman, pulled in too. (*See id.* at 81.) Jacob Marquez, the officer who saw Reza at the gas station, had also followed Reza and Rodriguez into the apartment parking lot and were present during the stop. (*See id.* at 82, 101–02.)

After Reza stopped, Rodriguez saw him roll down the passenger window and then roll it back up. (*Id.* at 71.) Knowing that Reza had been involved in a shoot-out with law enforcement and that he was flagged as armed and dangerous, this concerned Rodriguez. (*Id.*) Rodriguez exited his patrol car and asked Reza for his driver's license, proof of insurance, and proof of registration.[2] (*Id.* at 73.) Rodriguez identified Reza from his driver's license. (*Id.*) Rodriguez noticed that the address on the license was in the county and nowhere near the area of the traffic stop, which was in Carlsbad city limits. (*Id.* at 73–75.) Reza told Rodriguez that the SUV was his mother's and that he was unaware that the registration was expired. (*Id.* at 75.) Reza did not have proof of insurance, and Rodriguez allowed him to call his mother to obtain proof of insurance. (*Id.* at 75–76.) Reza was never able to obtain such proof. (*Id.* at 85.)

---

[2] Brakeman and Marquez also got out of their patrol vehicles and approached Reza's Nissan. (*See* Tr. at 81–82, 103 (citing Gov't Exs. 2–3).) Brakeman approached the passenger side, and Marquez shined a flashlight into the back of the SUV. (*See* Gov't Ex. 2 at 1:29–1:59.) A fourth officer, Edgar Jaramillo, was also on scene. (*Id.*; Tr. at 103.) Several minutes into the stop, Brakeman led her canine around Reza's vehicle, but the dog did not alert to the presence of drugs. (*See* Gov't Ex. 2 at 5:30–6:47.)

5

Rodriguez wrote Reza a citation for expired registration and issued him a warning for failure to provide proof of insurance.[3] (*See id.* at 77.) Rodriguez testified that, due to the expired registration and lack of proof of insurance, he believed that departmental policy also required him to have the vehicle towed.[4] (*See id.* at 85–86 (explaining his belief that CPD would be liable if he allowed someone to drive the vehicle without valid registration or proof of insurance).) He believed that neither an officer nor Reza's mother could move the car to a different parking space. (*Id.* at 86–87.)

After Rodriguez decided to impound the SUV, he asked Reza if he needed anything from the vehicle. (*Id.* at 87.) Reza asked for his wallet. (*Id.*) Rodriguez retrieved the wallet and looked through it to establish ownership and to make sure it did not contain contraband. (*Id.* at 87–88.) Reza also asked for house keys, which were on a key ring that contained a small coin pouch. (*Id.* at 87, 90.) Rodriguez felt the pouch and detected what he believed, based on his training and experience, were pills. (*Id.* at 90.) He opened the pouch and saw different colored pills, which were consistent with contraband. (*Id.*) Reza did not consent to Rodriguez's search, but Rodriguez believed that he had authority to search through everything in the vehicle as part of the "tow inventory."[5] (*Id.* at 89–91.)

Once he discovered the pills, Rodriguez read Reza his *Miranda* rights and asked him about the pills. (*Id.* at 91.) Reza refused to answer any questions. (*Id.*) Rodriguez put Reza under arrest for possession of a controlled substance and moved Reza to the back of his patrol unit. (*Id.* at 91–

---

[3] Rodriguez testified that if Reza had provided proof of insurance, he would have released him from the scene of the traffic stop. (Tr. at 77.)

[4] Despite Rodriguez's belief regarding CPD's tow policy, it is "[t]he United States' position . . . that [the] decision to impound the Nissan was not authorized . . . by CPD's Vehicle Towing and Inventory Policy." (Doc. 72 at 9 n.2.)

[5] During a tow inventory, officers look "through the vehicle to make sure that there's nothing of value" so that CPD is not liable for any missing items. (*See* Tr. at 112.)

92.) Rodriguez and Brakeman conducted a tow inventory of the vehicle. (*Id.* at 92.) Brakeman checked the passenger side of the vehicle and found a firearm in the back pouch area of the passenger seat. (*Id.*) At that point, in accordance with standard CPD procedure, Rodriguez and Brakeman stopped doing the inventory and contacted PVDTF to apply for a search warrant. (*Id.* at 92–93.) Rodriguez spoke to Sneathen, who advised Rodriguez to stop everything and seal the vehicle. (*Id.* at 93–94.) Rodriguez transported Reza to the CPD and had no further involvement. (*Id.* at 94.)

Stinson applied for a search warrant, and a state district court judge approved the warrant. (*See id.* at 31, 53.) Sneathen and Stinson executed the search warrant together in the early morning hours of July 18. (*Id.* at 53.) The officers located a Taurus 9-millimeter handgun in the back pouch of the passenger seat; two pills under the driver's seat; a Smith and Wesson .40 caliber firearm in a duffle bag in the back seat; and a large amount of ammunition (both .40 caliber and 9-millimeter). (*Id.* at 31–35; Gov't Exs. 6–11.) Reza now moves to suppress. (*See* Doc. 57.)

### III.   Legal Standards

In deciding this Motion to Suppress, the Court "must assess the credibility of witnesses and determine the weight to give to the evidence presented . . . ." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020) (citations omitted). Any "inferences the district court draws from that evidence and testimony are entirely within its discretion." *Id.* (citations omitted).

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021) (quoting U.S. Const. amend. IV) (emphasis omitted). "For a search or seizure to be reasonable, it must ordinarily be supported by a warrant based on probable cause." *Id.* (citations omitted). "Though 'the defendant bears the burden of proving whether and

when the Fourth Amendment was implicated, [t]he government then bears the burden of proving that its warrantless actions were justified [by an exception].'" *Id.* (citations omitted).

## IV. Analysis

Reza argues that Rodriguez conducted a pretextual traffic stop intending only to search Reza's vehicle for guns and drugs. (Doc. 57 at 4–6.) He further contends that the impoundment and inventory search were unconstitutional because they were not performed pursuant to standardized policies. (*Id.* at 6–10.) Reza asks the Court to suppress all evidence obtained from the search. (*See id.*) The Government "declines to rely on Officer Rodriguez's decision to impound and inventory the Nissan under CPD's impoundment policy" and argues that Rodriguez had probable cause to search the car under the automobile exception to the warrant requirement. (*See* Doc. 61 at 1 n.1, 6.) Thus, the Government contends, the evidence is admissible.[6]

### A. Rodriguez had probable cause to believe the SUV contained contraband.

"Searches 'conducted outside the judicial process without prior approval by judge or magistrate are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Arvizo*, No. 1:20-CR-00329 KWR, 2022 WL 1136773, at *16 (D.N.M. Apr. 18, 2022) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). "A warrantless vehicle search 'is permissible if there is probable cause to believe that the vehicle contains contraband.'" *United States v. Mazon*, 454 F. Supp. 3d 1155, 1169 (D.N.M. 2020) (quoting *United States v. Edwards*, 632 F.3d 633, 645 (10th Cir. 2001)).

The Government argues that Rodriguez had probable cause to search the SUV. (Doc. 61 at 5.) Reza disagrees and contends that the SOI's tip could not provide a sufficient basis for probable

---

[6] Even if the impoundment of the vehicle was not justified by standardized policy, the evidence may still be admissible if the search was otherwise valid. *See, e.g.*, *Arvizo*, 2022 WL 1136773, at *11 (even though the seizure of a vehicle was unlawful because it was not justified by the department's policy, the court found that "[t]he admissibility of the items found in the car also depends on the validity of the search that led to their discovery").

cause to search. (*See* Doc. 57 at 3–4.) Specifically, Reza contends that there is no evidence "that the officers had any information going toward the anonymous informant's veracity, reliability, or basis of knowledge." (*Id.* at 4.) The Court disagrees. "Where, as here, probable cause is based on an informant's tip, the court makes a probable cause determination based on the totality of the circumstances, including the informant's veracity, reliability, and basis of knowledge." *United States v. Hendrix*, 664 F.3d 1334, 1338 (10th Cir. 2011) (citing *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983); *United States v. Quezada-Enriquez*, 567 F.3d 1228, 1233 (10th Cir. 2009)). "These factors are not absolute, independent requirements that must be satisfied in order for probable cause to exist. . . . [A] deficiency in one factor may be compensated for by a strong showing of another or by other indicia of reliability." *Id.* (quoting *Quezada-Enriquez*, 567 F.3d at 1233). "An informant's tip which provides 'highly specific or personal details from which one could reasonably infer that the informant had firsthand knowledge about the claimed criminal activity' is more likely to be found sufficient to support probable cause." *Id.* (quoting *Quezada-Enriquez*, 567 F.3d at 1233). "Further, an informant's tip is more reliable if it is confirmed by officers' independent observations." *Id.* (citing *United States v. Artez*, 389 F.3d 1106, 1111 (10th Cir. 2004)).

The Government has established that Rodriguez[7] had credible information from an SOI who had proven to be reliable and trustworthy in the past. The SOI contacted Herrera as a citizen-informant without request or receipt of compensation or consideration for criminal charges. The SOI's information was based on firsthand knowledge and was detailed, providing Reza's name,

---

[7] Reza raises no argument that Rodriguez was unaware of this information. (*See* Doc. 57.) Even if he had, Rodriguez would be deemed to know under the "collective-knowledge doctrine," in which "the knowledge of one officer supporting a search or seizure may be imputed to other enforcement officers acting in conjunction with the knowledgeable officer." *James v. Chavez*, 830 F. Supp. 2d 1208, 1260 (D.N.M. 2011) (citing *United States v. Hensley*, 469 U.S. 221, 232–22 (1985); *United States v. Wilkinson*, 633 F.3d 938, 941 (10th Cir. 2008)).

the make and model of his vehicle, a note that his vehicle had chrome wheels, the street that Reza was driving on, and the contraband (fentanyl pills and firearms) present in his car.

The SOI's information was corroborated by information from two sources outside of CPD, including anonymous tips from Crime Stoppers as well as information from a reliable confidential source that Sneathen worked with in the past who stated that Reza was selling fentanyl. The confidential source saw Reza in possession of fentanyl and heard through word of mouth in the area's drug culture that Reza was a source of pills.

Finally, the SOI's information was corroborated by Rodriguez's personal knowledge and observations. Rodriguez, then an officer with the CPD for three years, knew that Reza was a convicted felon and a gang member with a history of involvement in guns and drugs. Rodriguez also knew that Reza previously threatened to shoot the police and was flagged as someone who was armed and dangerous. Rodriguez located Reza in the vehicle as described less than half a mile from the location the SOI provided. Reza drove toward a residential area known for its high rate of violent crime. When Rodriguez activated his siren to stop, Reza passed several areas where he could have stopped safely and instead drove 300 meters, causing Rodriguez to activate his siren a second time. "Rodriguez knew, based on his training and experience, that a motorist's failure to immediately stop can be indicative of criminal activity, to include hiding contraband such as guns and drugs before yielding." (Doc. 61 at 11 (citing *Courtney v. Okla. Dep't of Pub. Safety*, 722 F.3d 1216, 1224 (10th Cir. 2013)).)

The SOI's information was corroborated on multiple levels, supporting the SOI's veracity. *See United States v. Streett*, 363 F. Supp. 3d 1212, 1318 (D.N.M. 2018). Further, Herrera knew the SOI's identity, which is also an "indicator of veracity." *Id.* at 1319 (quoting *United States v. Pulliam*, 748 F.3d 967, 971 n.2 (10th Cir. 2014)).The SOI provided accurate information in the

past, indicating they were reliable. *See id.* at 1318; *see also United States v. Gonzales*, No. 1:19-CR-00240 KWR, 2020 WL 4201843, at *3 (D.N.M. July 22, 2020) ("The Court may consider an informant's past reliability as established by the testimony of an officer.") (citing *United States v. Samuels*, 493 F.3d 1187, 1191–93 (10th Cir. 2007) (no corroboration but officer's "testimony regarding the confidential informant's past reliability established the reliability of the tip."); *United States v. Leos-Quijada*, 107 F.3d 786, 792–93 (10th Cir. 1997) (tip was reliable where informant's previous tips resulted in the discovery of at least three marijuana loads and led to successful apprehensions approximately fifty percent of the time)). And the information was based on the SOI's firsthand observation, "entitl[ing] it to greater weight than secondhand information." *Streett*, 363 F. Supp. 3d at 1318 (quoting *Quezada-Enriquez*, 567 F.3d at 1233). The Court finds that the SOI's information was based on firsthand knowledge and was adequately reliable and credible. Together with Rodriguez's own knowledge and observations, including the knowledge that the SOI's information was corroborated by tips from other sources, the totality of the circumstances here would lead a reasonable officer to believe that Reza had contraband in his vehicle. *See United States v. Ledesma*, 447 F.3d 1307, 1316 (10th Cir. 2006).

"The 'automobile exception' to the warrant requirement permits law enforcement officers who have 'probable cause to believe a car contains contraband [to] search the car without first obtaining a search warrant.'" *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008) (quoting *United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007)) (subsequent citation omitted). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *Id.* at 1344 (quoting *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1212 (10th Cir. 2001)) (subsequent citation omitted). "Once the officer's suspicions rise to the level of probable cause, they are

11

empowered to search 'the entire vehicle, including the trunk and all containers therein that might contain contraband.'" *Id.* (quoting *United States v. Bradford*, 423 F.3d 1149, 1160 (10th Cir. 2005)). The Court finds that under the totality of the circumstances, a reasonable officer "with knowledge of the above-listed facts would have been within the Fourth Amendment's reasonableness bounds had they searched" the SUV Reza was driving. *See id.*

### B. Rodriguez's subjective reason for following Reza is irrelevant.

Reza contends that the Supreme Court "disapprov[es] of police attempts to use valid bases of action against citizens as pretexts for pursuing other investigatory agendas." (Doc. 57 at 5 (quoting *Whren v. United States*, 517 U.S. 806, 811 (1996)).) Reza makes this argument, however, in the context of his overarching contention that Rodriguez's decision to impound the car was unconstitutional. (*See id.* (noting that "while pretextual traffic stops are reasonable for purposes of federal Fourth Amendment analyses, subsequent searches done in the name of 'inventory or administrative regulation' but are not proven to be made for those purposes are forbidden") (quoting *Whren*, 518 U.S. at 811).) Again, however, the Government has expressly "decline[d] to rely on Officer Rodriguez's decision to impound and inventory the Nissan under the CPD's impoundment policy." (Doc. 61 at 1 n.1.) Reza makes no argument that the Government's decision in this regard is improper.

The *Whren* Court opined that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813. Rodriguez ultimately stopped Reza because the SUV had expired tags. Reza does not argue that this was an invalid reason for a traffic stop. In sum, the Court finds that there was probable cause under the totality of the circumstances to search Reza's vehicle for contraband, and Rodriguez's subjective intent in following Reza does not invalidate the lawful stop. *See id.* at 811 (noting that "only an undiscerning reader would regard

[cases invalidating pretextual police stops in the *absence* of probable cause] as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred"); *see also United States v. Montes-Ramos*, 347 F. App'x 383, 391 n.9 (10th Cir. 2009) (in analyzing whether automobile exception applied to warrantless search, Tenth Circuit noted that "[t]he fact the intrusion was for an investigatory purpose is not relevant to our analysis") (citing *United States v. Villamonte-Marquez*, 462 U.S. 579, 584 n.3 (1983) (rejecting argument that customs officials' ulterior motive for an otherwise valid warrantless boarding of a vessel might strip the officials of their legal justification); *United States v. Robinson*, 414 U.S. 218, 221 n.1 (1973) (lawful, post-arrest search for traffic violation would not be rendered invalid by the fact it was "a mere pretext for a narcotics search")).

Based on the totality of the circumstances, the Court finds that there was probable cause to search Reza's vehicle for contraband. The Court will deny Reza's motion to suppress.

**THEREFORE,**

**IT IS ORDERED** that Reza's Motion to Suppress (Doc. 57) is **DENIED.**

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE